SAFAS CORPORATION, Plaintiff,

v.

ETURA PREMIER, L.L.C., Defendant.

No. CIV.A.01–833–KAJ.

United States District Court,
D. Delaware.

Nov. 5, 2003.

Richard K. Herrmann, Esquire, Blank Rome LLP, Wilmington, DE, counsel for plaintiff. Of Counsel: Arthur M. Lieberman, Esquire and Dawn Rudenko, Esquire, Dickstein, Shapiro, Morin & Oshinsky LLP, New York City.

Frederick L. Cottrell, III, Esquire, Richards, Layton & Finger, Wilmington, DE, counsel for defendant. Of Counsel: T. Earl LeVere, Esquire, Bricker & Eckler LLP, Columbus, OH, Jerry K. Mueller, Esquire, Mueller and Smith, L.P.A., Columbus, OH.

**OPINION**

JORDAN, District Judge.

## I. INTRODUCTION

This is a patent infringement case. Jurisdiction is proper under 28 U.S.C. § 1338. Presently before me are the parties' requests for construction of the claims of United States Patent No. 5,476,895 (issued April 22, 1993) (the " '895 patent"), pursuant to *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The plaintiff in this case is Safas Corporation ("Safas") and the defendant is Etura Premier, L.L.C. ("Etura"). The following three disputed claim terms in claims 1–3 of the '895 patent are at issue and are construed herein: (1) "the granules comprising a thermoplastic and thermoset plastic," (2) "substantially immiscible," and (3) "substantially isopycnic."

## II. BACKGROUND

### A. *Procedural History*

On December 14, 2001, Safas filed a complaint alleging that Etura was willfully infringing the '895 patent. (Docket Item ["D.I."] 1 ¶ 9.) Etura answered Safas' complaint on January 2, 2002, denying all allegations of infringement and asserting several affirmative defenses, including invalidity of the '895 patent. (D.I.5.) The parties submitted a joint claim construction chart and filed claim construction briefing in September of 2003; they presented oral argument on their positions on October 22, 2003. (*See* D.I. 59, 78, 80, 93.)

### B. *The Disclosed Technology*

Safas is in the business of developing and manufacturing simulated granite and stone. (D.I. 1 ¶ 3.) Safas is the owner by assignment of the '895 patent, entitled "Granite–Like Coating" (issued April 22, 1993). (D.I.79, Exh. 1.) The named inventor is Akbar Ghahary. (*Id.*) The '895 patent discloses an invention that relates generally to a method of forming a synthetic surface material simulating various natural substances. *See* '895 patent, Col. 1, Ins. 11–14. Specifically, the invention provides a coating, comprised of a gel coat and granules, which mimics the appearance of granite. *Id.,* Col. 2, Ins. 63–67. The coating may be sprayed onto a surface or applied by brush, roller, or curtain wall. *Id.,* Col. 2, Ins. 22–24.

## III. APPLICABLE LAW

▮▮▮▮ Patent claims are construed as a matter of law. *Markman,* 52 F.3d at 979. A court's objective is to determine the plain meaning, if any, that those of ordinary skill in the art would apply to the language used in the patent claims. *Waner v. Ford Motor Co.,* 331 F.3d 851, 854 (Fed.Cir.2003) (citing *Rexnord v. Laitram*

*Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001)). In this regard, pertinent art dictionaries, treatises, and encyclopedias may assist a court. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202–03 (Fed.Cir. 2002). The intrinsic record, however, is the best source of the meaning of claim language. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Therefore, patent claims are properly construed only after an examination of the claims, the specification, and, if in evidence, the prosecution history of the patent. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1324 (Fed. Cir.2003) (citing *Vitronics*, 90 F.3d at 1582).

The intrinsic record is also of prime importance when claim language has no ordinary meaning in the pertinent art, *see Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1269–70 (determining that claim language could only be construed with reference to the written description)(citing *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed.Cir.1998)), and where claim language has multiple potentially applicable meanings. *Texas Digital*, 308 F.3d at 1203.

■ If patent claim language has an ordinary and accustomed meaning in the art, there is a heavy presumption that the inventor intended that meaning to apply. *Bell Atl.*, 262 F.3d at 1268 (citing *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed.Cir.1999)). Thus, unless the inventor has manifested an express intent to depart from that meaning, the ordinary meaning applies. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002) (en banc) (citing *York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed.Cir. 1996)).

To overcome that presumption, an accused infringer may demonstrate that "a different meaning is clearly set forth in the specification . . . or the accustomed meaning would deprive the claim of clarity." *N. Telecom Ltd. v. Samsung Elec. Co., Ltd.*, 215 F.3d 1281, 1287 (Fed.Cir.2000). However, the presumption may not be rebutted "simply by pointing to the preferred embodiment. . . ." *Teleflex*, 299 F.3d at 1327. It may be rebutted, though, where "the patentee . . . deviate[d] from the ordinary and accustomed meaning . . . by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.*

■ If claim language remains unclear after review of the intrinsic record, a court "may look to extrinsic evidence to help resolve the lack of clarity." *Interactive Gift Express, Inc. v. Compuserve Incorp.*, 256 F.3d 1323, 1332 (Fed.Cir.2001). The use of extrinsic evidence in the claim construction process, however, is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Id.* A court may not use extrinsic evidence to contradict the import of the intrinsic record, and if the intrinsic record is unambiguous, extrinsic evidence is entitled to no weight. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir. 1997).

## IV. CLAIM CONSTRUCTION

Safas alleges that Etura infringes claims 1–3 of the '895 patent. (D.I. 78 at 1.) In those claims, the parties dispute the meaning of the following claim terms: (1) "the granules comprising a thermoplastic and a thermoset plastic," (2) "substantially immiscible" and (3) "substantially isopycn-

ic." [1] A representative use of the disputed language is provided by the following claim from the '895 patent, with the disputed claim terms in italics:

1. A method of coating an article, which comprises

(a) preparing a coating composition comprising a gel coat and granules, *the granules comprising a thermoplastic and a thermoset plastic,* the granules being visually differentiable from the gel coat, and being *substantially immiscible* and *substantially isopycnic* in density with the gel coat; and

(b) contacting the article with the coating composition.

*See* '895 patent, col. 8, lns. 2–9.

A. *"the granules comprising a thermoplastic and a thermoset plastic"*

1. *The Parties' Proposed Constructions*

■ At the outset, the parties agree that "[t]he granules include both a thermoplastic component and thermoset plastic component" and that "[t]he claim does not disclose a limitation on the relative amounts of the two components." [2] (D.I. 59 at 1–2; D.I. 78 at 5.) However, Safas proposes that I construe this claim term to mean that the granules may comprise either a combination of discrete thermoplastic particulates and discrete thermosetting particulates mixed together into a matrix, or that each granule may have both a thermoplastic and thermoset plastic component. (D.I. 78 at 5.) Safas argues that because the claim language employs

the plural term "granules," and not other language such as "each granule comprising," those skilled in the art would "readily understand that claim 1 includes both a combination of discrete thermoplastic particulates and discrete thermosetting particulates which are mixed to form the 'granules,' and each granule having a thermoplastic and thermoset plastic component." (*Id.* at 6.) Safas also supports its proposed construction by referring to language in the specification of the '895 patent and the prosecution history. (*Id.*)

Etura proposes that I construe this claim term to mean that the individual granules must contain both a thermoplastic component and a thermoset plastic component. (D.I. 80 at 10.) Etura argues that Safas' proposed construction is inconsistent with the plain language of the claims, the specification of the '895 patent, and the prosecution history. (*Id.* at 8–9.)

2. *The Court's Construction*

I construe "the granules comprising a thermoplastic component and a thermoset plastic component" to mean that each individual granule must contain a combination of a thermoplastic component and a thermoset plastic component. This construction is consistent with the plain language of the claim and the specification. The claim language itself does not refer to a mixture of discrete thermoplastic granules and discrete thermoset plastic granules; rather, it refers only to "the granules." The specification points out "the advantage[s] of using *combined* thermo-

---

1. Claims 2 and 3 of the patent-in-suit depend from independent claim 1 and therefore contain the same limitations of the disputed claim terms.

2. The parties also agree that a thermoplastic component is "a material which is rendered soft and moldable by application of heat and is capable of reversibility and resolidification"

and that a thermoset plastic is "a material that has been hardened (set) by application of heat." (D.I. 59 at 1–2.) The parties' agreed-upon meanings are in line with the dictionary definitions of these terms. *See* Merriam-Webster's Collegiate Dictionary at 1220 (10th ed.2002).

plastic/thermoset plastic particulates" and that the "invention provides an alternative solution by forming particulates from a *combined* thermoplastic and thermoset plastic." '895 patent, Col. 2, Ins. 14–19 (emphasis added). Additionally, the prosecution history of the '895 patent indicates that the "particulate material" was formed "by *combining* thermoplastic and thermoset resins...." (D.I. 59, Exh. 2 at 4 (emphasis added).) Taking this evidence as a whole, it is apparent that the '895 patent discloses granules that are made from a combination of thermoplastic and thermoset plastic.[3]

## B. *"substantially immiscible"*

### 1. *The Parties' Proposed Constructions*

■ Safas proposes that I construe "substantially immiscible" to mean that the granules remain suspended as discrete entities in the neat gel coat, *i.e.*, that they do not largely mix or dissolve into the gel coat, remaining visually differentiable. (D.I. 78 at 9.) In support, Safas refers to dictionary definitions of the claim terms and to several instances in the specification discussing problems with the prior art granules "dissolving within a thermoplastic matrix" and how, in contrast, the granules of the '895 patent remain suspended in the gel coat matrix. *See* '895 patent, Col. 2, Ins 8–12; Col. 3, Ins. 36–38. Etura proposes that I construe "substantially immiscible" to mean substantially incapable of being mixed or of becoming homogeneous,

citing the specification as support. (D.I. 80 at 16.)

### 2. *The Court's Construction*

I construe "substantially immiscible" to mean that the granules are largely, but not wholly, incapable of being dissolved into the gel coat. The word "substantially" carries an ordinary and non-technical meaning in the asserted claims, permitting construction by reference to a dictionary definition. I construe "substantially" to mean "being largely but not wholly that which is specified." Merriam–Webster's Collegiate Dictionary at 1170 (10th ed.2002). The dictionary definition of "immiscible" is "incapable of mixing or attaining homogeneity." *Id.* at 579. The dictionary definition of "homogeneity" is "the quality or state of being of uniform structure or composition throughout." *Id.* at 554.

The '895 patent teaches that, in order to simulate the distribution of particles in natural granite, the granules must remain visible and be uniformly distributed and suspended in the gel coat. *See, e.g.,* '895 patent, Col. 3, Ins. 36–38. Further, the invention of the '895 patent overcomes the problems identified in the prior art, namely, that the "thermoplastic particulates dissolv[ed] within a thermoplastic matrix...." *Id.* at Col. 2, Ins. 8–12. The prosecution history of the '895 patent also supports Safas' proposed construction. (D.I. 59, Exh. 2 at 3 ("there were inherent problems pertaining to the dissolution of

---

**3.** Etura argues that I should construe the thermoplastic/thermoset plastic limitation as requiring a granule possessing the performance benefits described in the '895 patent and that is predominantly thermoset in nature. (D.I. 80 at 13.) Specifically, Etura asks me to construe the limitation as requiring "more thermoplastic material than what Safas argues occurs naturally in all thermoset plastic." (*Id.*) I decline to do so, as I am confi-

dent that the claim construction provided herein addresses Etura's concerns without imposing a quantitative limitation on the amount of thermoplastic material that must be present in each granule. Indeed, the parties have agreed that the claim does not disclose a limitation on the relative amounts of the thermoplastic and thermoset plastic components. (D.I. 59 at 1–2; D.I. 78 at 5.)

thermoplastic particulates in a thermoplastic matrix").)

Etura's proposed construction of "substantially immiscible" would mean that the granules are literally incapable of being mixed into and distributed throughout the gel coat. This runs counter to the teachings of the '895 patent. It is apparent from the claim language and the intrinsic evidence that the granules do not dissolve and are distributed evenly throughout the gel coat, purportedly providing a solution to shortcomings encountered in the prior art.[4]

### C. "substantially isopycnic"

#### 1. The Parties' Proposed Constructions

 The parties agree as to the meaning of the term "substantially isopycnic" but they disagree as to the degree or breadth to be afforded to the term. (D.I. 78 at 11.) Safas proposes that I construe "substantially isopycnic" to mean that the granules are sufficiently close in density with the gel coat so that they do not settle in the gel coat during preparation and use of the composition. (D.I. 78 at 11.) Etura proposes that I construe this claim term to require the specific gravity of the granules and the gel coat resin to be nearly identical with one another and to differ by no more than 0.1.[5] (D.I. 80 at 17.) In support of its position, Etura states that "[r]eferences in the patent specification and the cited prior art require that the term 'substantially isopycnic' receives a narrow construction." (D.I. 59 at 6; D.I. 80 at 17.) Specifically, Etura argues that

the teaching of the prior art Nogi, et al. patent,[6] which is referenced in the '895 patent, should be adopted in construing this claim term. (D.I. 80 at 17); see '895 patent, Col. 1, Ins. 64–67. Because Nogi, et al. taught "that the specific gravities of the granules and the resin matrix should differ by no more than +/0.1," Etura argues that the patent-in-suit should be construed to include the same teaching as a limitation. (Id.)

#### 2. The Court's Construction

I construe "substantially isopycnic" to mean that the granules are largely, but not wholly, of equal density with the gel coat. I again construe "substantially" to mean "being largely but not wholly that which is specified." Merriam–Webster's Collegiate Dictionary at 1170 (10th ed.2002). The dictionary definition of "isopycnic" is "of, relating to, or marked by equal or constant density." Id. at 621. Apart from the plain meaning of the claim terms, the specification of the '895 patent describes the densities of the gel coat and the granules as being "close to each other," a "match," and "almost the same." '895 patent, Col. 2, Ins 2, 5; Col. 6, Ins. 44–45.

Substantially is a term generally used "to avoid a strict numerical boundary to the specific parameter." Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298, 1310–11 (Fed. Cir.2003). Etura has offered no authority to support its argument that the teachings of the Nogi, et al. prior art reference

---

4. Both Safas and Etura cite deposition testimony to support their proposed claim constructions of "substantially immiscible;" however, the meaning of this claim term is clear from the intrinsic evidence, and therefore I need not consider the extrinsic evidence. See Interactive Gift Express, 256 F.3d at 1332.

5. Specific gravity is a unitless measure of density compared to the specific gravity of water, which is 1.0. (D.I. 80 at 17.)

6. The Nogi, et al. patent, United States Patent No. 5,043,377 is entitled "Granite-like artificial stone" and issued on August 27, 1991.

should be imported to the claim construction of the patent-in-suit. Therefore, I decline to adopt Etura's proposed claim construction to limit "substantially isopycnic" to a +/0.1 range in difference of specific gravity between the granules and the gel coat.

## V. CONCLUSION

For the reasons set forth herein, I will construe the disputed claim terms as follows:

| CLAIM TERM | THE COURT'S CONSTRUCTION |
| --- | --- |
| "the granules comprising a thermoplastic and thermoset plastic" | The Court construes the phrase "the granules comprising a thermoplastic and thermoset plastic" to mean that each individual granule must contain a combination of a thermoplastic component and a thermoset plastic component. |
| "substantially immiscible" | The Court construes the phrase "substantially immiscible" to mean that the granules are largely, but not wholly, incapable of being dissolved into the gel coat. |
| "substantially isopycnic" | The Court construes the phrase "substantially isopycnic" to mean that the granules are largely, but not wholly, of equal density with the gel coat. |

For those claim terms not specifically addressed above, I will adopt the claim constructions offered by the parties in their Joint Construction Claim Chart (D.I.59), filed on September 5, 2003.

An appropriate Order will issue.